[Cite as *State v. Dean*, 2018-Ohio-1740.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

Court of Appeals No. L-16-1301

Appellee

Trial Court No. CR0201602171

v.

Aaron Dean

**DECISION AND JUDGMENT**

Appellant

Decided: May 4, 2018

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Claudia A. Ford, Assistant Prosecuting Attorney, for appellee.

Karin L. Coble, for appellant.

* * * * *

**MAYLE, J.**

**{¶ 1}** The defendant-appellant, Aaron Dean, was indicted on felonious assault, kidnapping, and two counts of rape. Following a bench trial, the Lucas County Court of Common Pleas convicted him of all counts and imposed an aggregate sentence of 16 years in prison. On appeal, Dean argues that his convictions were not supported by

legally sufficient evidence and were against the manifest weight of the evidence.  He also argues that the two rape convictions should merge with one another, and that the rape and kidnapping convictions should also merge.   Finally, Dean challenges the costs imposed by the trial court.  For the reasons that follow, we affirm the trial court's judgment in its entirety.

**Facts and Procedural History**

{¶ 2}   The victim in this case, referred to as "I.M.R.," offered the following testimony at trial.  I.M.R. is a married, mother of three.  Between 8:30 and 9:00 p.m. on April 20, 2016, I.M.R. was walking on Lagrange Street in downtown Toledo, near the Gold Star liquor store, talking on her cell phone with a friend.  A person, whom she identified in court as Dean, approached her from behind.  When I.M.R. turned to face him, Dean said, "if you don't come with me, I'm going to shoot you out here."  Dean showed her a black gun from within his coat.

{¶ 3}   I.M.R. hung up on her friend and followed Dean, walking behind him and "hoping he wouldn't shoot" her.  Dean led I.M.R. for a block or two down Lagrange, then to an alley which led to the back porch of an abandoned duplex.  Dean sat on a chair and ordered I.M.R. to her knees.  I.M.R. testified that, "[Dean] told me if I didn't give him oral he's going to shoot me in the head.  So I got down and I gave him oral."  Dean had an erection and ejaculated into her mouth, which she spat out.  Dean then pulled the trigger of the gun, but it did not fire.  Dean said, "[o]ops, you almost got killed. * * * [I]f you don't do it again, you going to get killed * * *."

2.

**{¶ 4}** I.M.R. then "went down there" and performed oral sex on Dean again. While she did, Dean put the gun back into his coat pocket. I.M.R. testified, "I had a lot of thoughts going through my head" including that "he was going to kill me" and "I wasn't leaving that night." I.M.R. decided to fight back and bit down on Dean's penis. She testified, "I tried to bite it off, but my whole body wouldn't let me * * * because I was too weak." Dean screamed and "socked" I.M.R. in the head.

**{¶ 5}** The two began to fight. As described by I.M.R., she "head butted" and "kneed [Dean] in his stuff." Dean pulled the gun back out of his pocket. I.M.R. reached for the gun and managed to pull the trigger. I.M.R. heard the gun "click" a couple of times. She testified, "I was like, 'damn, you ain't even got no bullets.' He said, '[epithet], your ass is gone' and I tried to run." Dean yanked the gun away from I.M.R., but her finger was stuck in the trigger, causing her skin to rip off. The gun fell. Dean then pulled I.M.R. by the hair and began "socking" her in the head and face with a closed fist. I.M.R. returned Dean's punches with her own and pulled out a 4-inch bread knife from within her pocket. The knife fell to the ground. I.M.R. and Dean each screamed and fled. Dean ran toward the front of the house, and I.M.R. ran toward the back.

**{¶ 6}** I.M.R. got herself to St. Vincent Medical Center in downtown Toledo. The earliest medical record created that night indicates a time of 10:50 p.m. At that time, I.M.R. reported that she had been raped, that she thought she may have bitten the genitals off of her attacker, and that she thought she had a broken nose. The hospital records confirm a nasal fracture. While at the hospital

3.

that night, I.M.R. reported the incident multiple times, to nurses, physicians, and the police.

{¶ 7} Registered Nurse Courtney Whited examined I.M.R. that evening. Whited is a sexual assault nurse examiner ("SANE") who is trained to administer care to sexual assault victims and to collect and secure evidence. Whited described I.M.R. as upset and not very talkative. She observed that I.M.R.'s face was swollen with dried blood below her nose and on her cheeks. Whited testified that "something had definitely happened [to her] at some point during the night." According to Whited's report, I.M.R. told her that an unknown man had forced her at gunpoint to "walk with him * * * for a few streets" and then demanded that she "suck his dick or 'I'll shoot you.'" I.M.R. estimated that the assault lasted about 30 minutes. Whited collected swab samples from inside I.M.R.'s mouth and from around her face. She also took photographs. Whited turned the evidence over to the police.

{¶ 8} The hospital reported the rape to the Toledo Police. Officer Bradley Knapp was dispatched to the hospital and interviewed I.M.R. He described I.M.R. as "very frantic" and "panicky." Because potential felonies were involved, Officer Knapp contacted the police department's investigative services division, which dispatched Detective Diane Trevino. Detective Trevino works in the special victims unit and investigates sexual assault cases. She interviewed I.M.R. and based on I.M.R.'s

4.

description of the location, Detective Trevino and Officer Knapp left the hospital in search of the crime scene.

{¶ 9} The officers were able to locate the abandoned duplex and alley off Palmer Street, which intersects with Lagrange. On the cement patio, the officers observed a gun (later identified as a "Ruger air pistol"), an overturned chair, a cell phone (which was later identified as I.M.R.'s phone), a few drops of blood, and a black stocking hat. Detective Trevino called Detective Terry Cousino, who arrived at the scene around 2:00 a.m. Detective Cousino photographed and collected the evidence, including two blood swabs from the porch. I.M.R.'s knife was not among the evidence collected at the scene. The police turned over the evidence to the Ohio Bureau of Criminal Investigations ("BCI") for forensic testing.

{¶ 10} Julie Cox is a forensic scientist with the BCI. Cox is trained to perform examinations for the presence of biological fluids such as semen, saliva, and blood. Cox tested the items in I.M.R's rape kit. She identified the presence of seminal fluid and blood on I.M.R.'s oral samples. She also identified blood on the air pistol and more blood from the two samples taken from the porch floor. Logan Schepeler, also with the BCI, is a deoxyribonucleic acid ("DNA") analyst. Schepeler analyzed samples taken from I.M.R.'s right hand, the swab sample from the air gun, the nylon cap, the oral samples taken from I.M.R., and fingernail scrapings. The BCI analyzed that evidence and, based on the agency's findings, it identified Dean as a possible suspect.

5.

Specifically, Schepeler concluded that Dean's DNA matched DNA found on the nylon cap and was a significant match to the DNA found on the gun.

{¶ 11} On May 13, 2016, the BCI provided Dean's name as a possible suspect to the Toledo Police. Detective Trevino, in turn, prepared a photo array. The array shows six individuals, and Dean was shown in photograph No. 5. Three days later, Toledo Police Officer Kevin Konz administered I.M.R.'s viewing of the photo array. Konz had no knowledge of the facts of the case, which is standard operating procedure when presenting a photo array to a witness. According to Officer Konz, I.M.R. identified Dean as her attacker "immediately."

{¶ 12} Detective Trevino obtained a search warrant for Dean's DNA as a "confirmatory" measure. At the time, Dean was being held in the Lucas County Jail on an unrelated assault charge. Detective Trevino collected two DNA swabs from Dean and sent those to the BCI for testing. The BCI reported back that Dean's DNA matched the evidence that had been sent there. That evidence was then presented to the Lucas County Grand Jury.

{¶ 13} On June 24, 2016, the Grand Jury indicted Dean on two counts of rape, in violation of R.C. 2907.02(A)(2) and (B), felonies of the first degree; felonious assault, in violation of R.C. 2903.11(A)(1) and (D), a felony of the second degree; and kidnapping, in violation of R.C. 2905.01(A)(4) and (C), a felony of the first degree.

6.

**{¶ 14}** On July 6, 2016, Detective Trevino interviewed Dean in jail. The recorded interview was played at trial. Detective Trevino advised Dean of his *Miranda* rights, showed him a picture of I.M.R., and the following exchange took place:

Q. Do you know that female?

A. No ma'am.

Q. You don't think you've ever seen her before?

A. No ma'am.

Q. Never had a sexual relationship with that female?

A. Never had a sexual relationship with that female at all.

Q. * * * Do you know her at all for any reason * * *?

A. She could be a prostitute. She looks like a prostitute.

**{¶ 15}** Dean admitted that he occasionally had relations with prostitutes, but he was adamant that he was with his girlfriend on April 20, 2016 and that he "ain't never seen" I.M.R. He claimed that he stayed at the home of his girlfriend's mom between April 20 and May 26, 2016, when he was arrested for domestic violence.

**{¶ 16}** At trial, Dean repeated his claim that he was with his then-girlfriend, N.W., on the evening of April 20, 2016. Dean testified that the two of them attended a family birthday party on Elm Street, along with N.W.'s mother, Barbara. Dean estimated that they were at the party between 8:00 p.m. and 9:30 p.m., when the three of them returned to Barbara's home on Locust Street. Dean spent the night there, and stayed there until he was arrested for assaulting N.W.

7.

{¶ 17} At trial, Dean changed part of his story. Although he previously told Detective Trevino that he did not know I.M.R., he testified at trial that he had a sexual encounter with I.M.R. a "couple of days before" April 20, 2016. Dean claims that he gave I.M.R. fake drugs in exchange for sex, and that the encounter was consensual. According to Dean, he ground up a white candle to look like crack, which he intended to use "to get sex from a drug addict." Dean walked down Lagrange "intending to go have sex with a prostitute if [he saw] one walking down the street." Dean claims he saw I.M.R., and he assumed she was a prostitute because she was standing on the corner of Lagrange which he knew to be frequented by "prostitutes, drug dealers and johns." Dean asked if I.M.R. would "like to exchange oral sex for some dope." Dean testified that the two of them walked down the street for a couple of blocks, then down an alley; that he put on a condom to protect himself from a sexually transmitted disease; and that I.M.R. performed oral sex on him. Afterward, Dean removed his condom and gave I.M.R. the "dummy dope." According to Dean, it was I.M.R. who was carrying the gun, which she offered to Dean in exchange for "another dope piece." Dean declined the offer and left "quickly before she could find out that the dope was fake."

{¶ 18} Dean admits that his DNA was found inside and outside of I.M.R.'s mouth and that his and I.M.R.'s DNA were on the trigger of the gun. Dean denied any type of physical altercation between himself and I.M.R., and specifically denied that I.M.R. bit his penis.

8.

**{¶ 19}** N.W. and her mother Barbara testified by subpoena. N.W. testified that Dean came over around 5:30 or 6:00 p.m. on April 20, 2016; that they went to her nephew's birthday party on Elm Street; that they stayed at the party about four and one-half to five hours; and that they returned to her mother's home around 10:30 or 11:00 p.m. N.W. asserted that Dean "stayed with us the whole time." Barbara offered similar testimony, but thought that the three of them left the birthday party a little earlier, around 9:30 or 10:00 p.m.

**{¶ 20}** The trial court took the matter under advisement. On December 5, 2016, the court found Dean guilty of two counts of rape (fellatio), one count of felonious assault, and one count of kidnapping. In its order, the trial court commented,

> [T]he state has proven all of the essential elements of each of the charges beyond a reasonable doubt [and Dean's] version of events does not survive scrutiny. He denies ever having seen [I.M.R.] to Detective Trevino, and denies having any sexual relations with her. Then his DNA is found in her mouth and around her face. He denies any physical altercation, but his DNA is found on the gun. He claims a prostitute, two days earlier, tried to sell him the gun for drugs, but it was all messed up and had no handle. The gun found at the scene obviously has a handle, and although it is some form of air pistol, it looks passably like a handgun. He is a trained boxer, and [I.M.R.'s] face looks like it was treated as a punching bag.

9.

**{¶ 21}** A sentencing hearing was held on December 12, 2016. The court sentenced Dean to eight years in prison as to Count 1 (rape); eight years as to Count 2 (rape); eight years as to Count 3 (felonious assault), and six years as to Count 4 (kidnapping). It ordered that Counts 1, 2, and 4 be served concurrently, but consecutive to Count 3, for a total prison term of 16 years. The court specifically found that none of the charges were allied offenses of similar import and therefore none of them merged. Through his appointed appellate counsel, Dean appealed. He asserts three assignments of error:

> **Assignment of Error One**: Appellant's convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.

> **Assignment of Error Two**: The trial court erred in failing to merge the two counts of rape, and erred in failing to merge the rape counts with the kidnapping count, thereby violating the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.

> **Assignment of Error Three**: The trial court erred in imposing the cost of appointed counsel fees and costs of confinement.

10.

**Sufficiency and Manifest Weight of the Evidence**

{¶ 22} In his first assignment of error, Dean argues that his convictions were not supported by legally sufficient evidence and were against the manifest weight of the evidence.

{¶ 23} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). We examine the evidence in the light most favorable to the state and decide whether any rational trier of fact could have found that the state proved, beyond a reasonable doubt, all of the essential elements of the crime. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 78.

{¶ 24} In determining whether a conviction is based on sufficient evidence, an appellate court does not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. *See Jenks*, paragraph two of the syllabus; *Yarbrough* at ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim). We will not disturb the verdict unless we determine that reasonable minds could not arrive at the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001); *Jenks* at 273. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Thompkins* at 386.

11.

{¶ 25} While sufficiency of the evidence examines whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386. Under the manifest weight of the evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive—the state's or the defendant's? *Id*. at ¶ 25. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387.

{¶ 26} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony." *Wilson* at ¶ 25, quoting *Thompkins* at 387. In determining whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving any conflicts in the evidence, the jury clearly lost its way and thereby created such a manifest miscarriage of justice that the conviction must be reversed and a new trial must be ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 27} A conviction should be reversed on manifest weight grounds only in the most "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175. Moreover, "'it is inappropriate for a reviewing

12.

court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" *State v. Brown*, 10th Dist. Franklin No. 02AP-11, 2002-Ohio-5345, ¶ 10, quoting *State v. Long*, 10th Dist. Franklin No. 96APA04-511, 1997 Ohio App. LEXIS 416 (Feb. 6, 1997).

### 1. Rape

{¶ 28} With the above framework in mind, we begin with Dean's challenge to the legal sufficiency and manifest weight of the evidence supporting the rape convictions.

{¶ 29} R.C. 2907.02(A)(2) provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "Sexual conduct" includes "fellatio" which occurs when "the mouth or lips come into contact with the penis." R.C. 2907.01(A); *State v. Brown*, 12th Dist. Butler No. CA2011-11-207, 2013-Ohio-1610, ¶ 36. "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

{¶ 30} At the close of the state's case, Dean's trial counsel argued that the state's evidence did not establish two separate and differentiated acts of rape. Pursuant to Crim.R. 29(A), Dean moved for an acquittal, as to "either" rape count. The trial court denied the motion, and Dean claims this was error. He argues that I.M.R.'s testimony, even if believed, would support only one act of rape because "the oral sex was not interrupted by any significant intervening event, and [was] committed at the same time, during the same course of conduct."

13.

{¶ 31} A motion for acquittal under Crim.R. 29(A) challenges the sufficiency of the evidence. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 39. The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 32} The state relies upon the following testimony by I.M.R. to establish that Dean raped her twice:

Q. So he took you onto that abandoned porch, holding * * * the gun * * *. What happened next?

A. [H]e told me if I didn't give him oral he's going to shoot me in the head. So I got down and I gave him oral. I was like, man, just don't shoot me. * * *

Q. When you say oral, do you mean that he made you put your mouth on his penis?

A. Yes.

Q. Okay. So what happened?

A. So then I have him oral. He had an erection. And he pulled the trigger.

Q. On the gun?

14.

A. Uh-huh. And he was like, oops, you almost got killed. And he was like if you don't do it again, you going to get killed. He said don't make me kill you back here and then he was like - -

Q. Let me interrupt you. I am sorry. When you said he did it again, did he finish the first time?

A. Finish what?

Q. Did he ejaculate into your mouth?

A. Yes, he had an erection.

Q. And he completed the act, he actually - -

A. Yes.

Q. - - ejaculated in your mouth?

A. Yes. And I spit it out.

Q. You spit it out?

A. And that's what he - - he told me I had to do it again.

Q. And so what did you do when he told you that?

A. Well I went down there. I had a lot of thoughts going through my mind. I just knew I was going to die on this back porch. I was going to end up in this abandoned house. Nobody was going to know what happened to me * * *.

{¶ 33} Examining the evidence in the light most favorable to the state, Dean forced I.M.R. to perform fellatio two distinct times, each under a threat to kill. At the

completion of the first rape, Dean ejaculated into I.M.R.'s mouth and withdrew his penis. I.M.R. spat out the ejaculate. A second rape then occurred when Dean, once again, forced his penis into her mouth after threatening to kill her if she did not "do it again." During the second rape, I.M.R. fought back by biting Dean, and a physical fight ensued.

{¶ 34} Dean complains that the state misstated the sequence of events when urging the court to deny his motion to acquit. According to Dean, I.M.R. testified that Dean pulled the trigger of the gun (which did not fire), ejaculated, and then ordered her to perform fellatio again. Dean claims the state incorrectly argued that Dean ejaculated and *then* pulled the trigger. We find that I.M.R.'s testimony does not support Dean's version of events and, regardless, the order of those specific events is irrelevant. What matters is that I.M.R. testified that Dean penetrated her two separate times after threatening to kill her if she did not comply with his demands. In fact, the second rape occurred after Dean renewed his threat to kill her if she did not "do it again." We reject Dean's argument that the two oral rapes were actually one continuous act without any substantial intervening event.

{¶ 35} We find that I.M.R.'s testimony that she was forced to perform fellatio on Dean two times, "if believed, is sufficient to support each element of rape." *State v. Robinson*, 6th Dist. Lucas No. L-09-1001, 2010-Ohio-4713, ¶ 100; *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 53; *State v. Wampler*, 6th Dist. Lucas No. L-15-1025, 2016-Ohio-4756, ¶ 58. Moreover, although I.M.R.'s testimony need not be supported by physical evidence or other corroborating testimony, there is

16.

DNA evidence linking Dean to the crime. For all of these reasons, we find that each count of rape is supported by legally sufficient evidence.

{¶ 36} Dean also argues that the rape convictions were against the manifest weight of the evidence. He claims that several pieces of evidence demonstrate that Dean and I.M.R. engaged in consensual sex.

{¶ 37} First, Dean argues that Detective Trevino's testimony regarding a "SkyCop" video from outside the liquor store demonstrates that Dean did not kidnap I.M.R and, therefore, the sex must have been consensual as well. Although the video was not entered into evidence, Detective Trevino testified that I.M.R. is shown talking on her cell phone while crossing the street, but Dean is not visible. Dean argues that his absence from the video proves that I.M.R. followed him voluntarily to engage in sex. We disagree. Assuming that the video shows I.M.R. crossing the street alone, the footage may have been captured before Dean approached her. Regardless, given that the SkyCop video is not in the record, we cannot view it and must presume regularity in the proceedings. *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199, 400 N.E.2d 384 (1989). We certainly cannot find that the rape convictions are against the manifest weight of the evidence based on evidence that is not in the record.

{¶ 38} Dean also complains that the rape convictions should be overturned because I.M.R. is not credible. He claims that I.M.R. "was in fact a prostitute who was upset that the drugs were fake," relying upon his own testimony that I.M.R. performed fellatio on him for "fake crack" a few days before she was attacked. Dean also claims

17.

that I.M.R. "changed her version of facts," and offers one example: a medical report that was prepared by Gordon Bee, R.N., on the night of the rapes. According to that report, I.M.R. said that her attacker "forced her into a car and threatened her with a gun [and stated] 'if she didn't suck his dick he would piss on her.'" The report contradicts three other reports prepared that evening, as well as I.M.R.'s trial testimony and the testimony of two police officers, who testified that I.M.R. was forced *to walk* to the location of the rapes. I.M.R. testified that she did not remember making the statements attributed to her in Bee's report, and she specifically denied making them to Detective Trevino in a subsequent interview with her.

{¶ 39} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the fact finder's credibility determinations, given that it is the fact finder who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. The trial judge, as finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 6th Dist. Wood No. WD-07-009, 2008-Ohio-1557, ¶ 62, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). Although we acknowledge, as the trial court did, that the state's case is not free of inconsistencies, we find that none of the purported evidence cited by Dean undermines the trial court's conclusions that (1) the state proved the

18.

elements of its rape case beyond a reasonable doubt and (2) Dean's "version of events does not survive scrutiny." As the court noted, Dean is an admitted liar.

{¶ 40} Upon review of the entire record, we find that the trial court could reasonably conclude from the evidence presented that the state proved the offenses of rape beyond a reasonable doubt. We further find that the court, as trier of fact, did not clearly lose its way or create a manifest miscarriage of justice.

## 2. Kidnapping

{¶ 41} Dean was also found guilty of kidnapping pursuant to R.C. 2905.01(A)(4) which provides that, "(A) No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, * * * [t]o engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will."

{¶ 42} In support of its kidnapping case, the state relied upon I.M.R.'s testimony that Dean removed I.M.R. from the location where he found her, on Lagrange Street outside of the liquor store, under threat of force, for the purpose of engaging in sexual activity against I.M.R.'s will.

{¶ 43} Dean makes no argument to support his conclusion that the kidnapping conviction is not supported by legally sufficient evidence. Instead, Dean simply restates his own version of events and argues that I.M.R. was not credible. In analyzing whether a conviction is based upon sufficient evidence, however, we do not assess whether the evidence is to be believed, but instead, whether the evidence, if believed, would support a

19.

conviction. Here, the testimony of I.M.R., if believed, is sufficient to find Dean guilty of kidnapping.

{¶ 44} As for the weight of the evidence, Dean argues that he is more credible than I.M.R due to her "conflicting statements." But "[a] conviction is not against the manifest weight of the evidence merely because the jury believed the prosecution testimony." *State v. Houston*, 10th Dist. Franklin No. 04AP-875, 2005-Ohio-4249, ¶ 38 (reversed and remanded in part on other grounds). We find that Dean's kidnapping conviction is not against the manifest weight of the evidence.

### 3. Felonious Assault

{¶ 45} Dean was also convicted of felonious assault. R.C. 2903.11(A)(1) provides that "no person shall knowingly * * * [c]ause serious physical harm to another * * *." "Serious physical harm" is defined as "[a]ny physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5)(e).

{¶ 46} Dean put forth no argument to challenge his felonious assault conviction except to say that "if his convictions for rape and kidnapping were against the manifest weight of the evidence, or were unsupported by sufficient evidence, [then] the conviction for felonious assault would logically also have to be vacated and reversed."

{¶ 47} Upon review of the evidence submitted at the trial below, we find that there was sufficient evidence to find that Dean caused serious physical harm to I.M.R., and the conviction was not against the manifest weight of the evidence. At trial, I.M.R. testified

20.

that Dean gave her a fractured nose, lacerations to her face and hands, and a spinal cord injury. I.M.R.'s testimony was corroborated with pictures and medical reports, and the trial court found the state's evidence persuasive, commenting that "[Dean] is a trained boxer, and [I.M.R.'s] face looks like it was treated as a punching bag." In determining whether the state proved the "serious physical harm" element, Ohio appellate courts have held that "[w]here injuries are serious enough to cause [the victim] to seek medical treatment, the finder of fact may reasonably infer that the force exerted on the victim caused serious physical harm as defined by R.C. 2901.01(A)(5)." (Citations omitted.) *State v. Lee*, 6th Dist. Lucas No. L-06-1384, 2008-Ohio-253, ¶ 30. Further, "[w]here the assault causes a bone fracture, the element of serious physical harm is met." *Id.*

{¶ 48} In sum, we find that all of Dean's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence. Dean's first assignment of error is found not well-taken.

**Merger of Allied Offenses**

{¶ 49} In his second assignment of error, Dean alleges that the trial court erred (1) by failing to merge his rape convictions with one another and (2) by failing to merge his kidnapping conviction with his rape convictions. We review de novo a trial court's ruling as to whether convictions merge under the allied-offenses doctrine. *State v. Corker*, 10th Dist. Franklin No. 13AP-264, 2013-Ohio-5446, ¶ 28, citing *State v. Roush*, 10th Dist. Franklin No. 12AP-201, 2013-Ohio-3162, ¶ 47.

21.

{¶ 50} In its December 5, 2016 judgment entry, the trial court found Dean guilty as to all four counts. It also found, sua sponte and without comment, that none of the convictions were allied offenses of similar import, and therefore none of them merged. At the sentencing hearing, one week later, Dean acknowledged the court's ruling on merger but did not object to it. Dean did, however, urge the court to impose concurrent sentences. The court sentenced Dean to serve eight years for each rape conviction and six years for the kidnapping conviction, to be served concurrently to one another (but consecutively to the eight-year sentence for the felonious assault conviction). Dean's merger arguments are not moot even though the court ordered concurrent sentences. "[E]ven when the sentences are to be served concurrently, a defendant is prejudiced by having more convictions than are authorized by law." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E. 923, ¶ 31.

{¶ 51} But, a defendant who fails to raise the issue of allied offenses of similar import in the trial court forfeits all but plain error. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 3. "Forfeited error is not reversible error unless it affected the outcome of the proceeding and reversal is necessary to correct a manifest miscarriage of justice." *Id.* A defendant must "demonstrate a reasonable probability that the convictions are for allied offenses of similar import committed with the same conduct and without a separate animus," and "absent that showing, the accused cannot demonstrate that the trial court committed plain error by failing to inquire whether the convictions merge for purposes of sentencing." *Id.* "Notice of plain error under Crim.R.

22.

52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. Accordingly, given that Dean did not raise the issue of allied offenses of similar import in the trial court, we review this issue on appeal for plain error.

{¶ 52} The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution, applicable to the state through the Fourteenth Amendment, "protects against three abuses: (1) 'a second prosecution for the same offense after acquittal,' (2) 'a second prosecution for the same offense after conviction,' and (3) 'multiple punishments for the same offense.'" *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10, quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds*, *Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). R.C. 2941.25 codifies the Double Jeopardy Clause's third protection, which prohibits multiple punishments for the same offense. The statute prohibits multiple convictions for "allied offenses of similar import" arising out of the same conduct. R.C. 2941.25 states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

23.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 53} "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *Ruff* at ¶ 26. This means that the "analysis may be sometimes difficult to perform and may result in varying results for the same set of offenses in different cases. But different results are permissible, given that the statute instructs courts to examine a defendant's conduct—an inherently subjective determination." *Id.* at ¶ 32.

{¶ 54} In *Ruff*, the Supreme Court of Ohio announced that whenever a court considers whether there are allied offenses that merge into a single conviction, the court "must first take into account the conduct of the defendant. In other words, how were the offenses committed?" *Id.* at ¶ 25. When considering this overarching question, the court must address three sub-questions: (1) Were the offenses "dissimilar in import," meaning did the offenses involve either separate victims or "separate and identifiable" harm? (2) Were the offenses committed separately? and (3) Were the offenses committed with separate animus? *Id.* at ¶ 23-25. "An affirmative answer to *any* of the above will permit separate convictions. The conduct, the animus, and the import must all be considered." (Emphasis added.) *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266,

24.

¶ 12. The defendant bears the burden to establish that R.C. 2941.25 prohibits multiple punishments. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18, citing *State v. Mughni*, 33 Ohio St.3d 65, 67, 514 N.E.2d 870 (1987).

### 1. The Rape Convictions Do Not Merge

{¶ 55} In support of merging his rape convictions, Dean relies on the same basic argument that he raised in his first assignment of error, i.e. that his actions amount to a continuing course of conduct with no significant break in time or intervening act. We have already rejected this argument as it relates to whether each rape conviction was supported by legally sufficient evidence. Here, Dean argues in the alternative that, even if he could be found guilty of two counts of rape, the convictions must merge because his "conduct constituting the two counts of rape occurred at the same time, were the same act, and were allegedly done to the same victim."

{¶ 56} Turning to the first question posed in *Ruff*, because the offenses were perpetrated against the same victim, we must consider whether the two rapes caused I.M.R. to suffer "separate and identifiable" harm. We find that they did. Each oral rape caused independent physical injury and exposed I.M.R. to an increased risk of contracting a sexually transmitted disease. Indeed, I.M.R. repeatedly expressed her fear, at the hospital and at trial, that she had been exposed to warts or human immunodeficiency virus ("HIV") from Dean. It may also be said, as a matter of law and common sense, that each rape caused I.M.R. to suffer separate and additional psychological trauma. *See State v. Barnes*, 68 Ohio St.2d 13, 14, 427 N.E.2d 517 (1981)

(J. Celebrezze concurring opinion) ("Each [sexual assault] is a further denigration of the victim's integrity and a further danger to the victim."). We therefore find that each rape caused I.M.R. to suffer separate and identifiable harm.

{¶ 57} We also find that the two rapes were committed separately and with a separate animus, the second and third prongs of the *Ruff* analysis, which we consider together. In *State v. Woods*, 6th Dist. Lucas Co. L-13-1181, 2014-Ohio-3960, we recognized,

> Separate conduct or separate animus may occur when a court determines the defendant at some point broke a temporal continuum started by his initial act. * * * Alternatively, a separate conduct or animus may exist when facts appear in the record that distinguish the circumstances or draw a line of distinction that enables a trier of fact to reasonably conclude separate and distinct crimes were committed. (Internal citations omitted.)
> *Id.* at ¶ 35 quoting *State v. Nuh*, 10th Dist. Franklin No. 10AP-31, 2010-Ohio-4740, ¶ 16.

{¶ 58} With regard to whether the offenses were committed separately, "[t]he law in Ohio is clear that multiple separate and distinct acts of penetration will support multiple convictions and sentences, and oral, anal, and vaginal rapes constitute separate and distinct acts." *State v. Hall*, 6th Dist. Lucas No. L-17-1069, 2018-Ohio-619, ¶ 10, citing *State v. Hernandez*, 12th Dist. Warren No. CA2010-10-098, 2011-Ohio-3765, ¶ 48 and *State v. Pippin*, 1st Dist. Hamilton Nos. C-160380, C-160381, 2017-Ohio-6970,

¶ 49. In *Hall*, we recently held that "whether [the defendant] raped [the victim] on only two occasions over a one-year period * * * or whether, for instance, he penetrated her both anally and vaginally on one occasion, two separate and distinct rapes were committed and two sentences were properly imposed."

{¶ 59} Dean concedes the basic premise that different forms of penetration (i.e. vaginal, anal, or oral) will support multiple convictions. He argues that his rape convictions should merge because his alleged conduct involves "the same act," i.e., fellatio, and was "part of a continuing course of conduct." This same argument was made by the defendant in *State v. Pippin*, who was also found guilty of two counts of oral rape that were perpetrated in close succession to the other. Like here, the defendant argued that both counts relate to "the same act, same day, same location, and same victim." The First Appellate District found that the convictions did not merge,

> [T]he record demonstrates that, although both rape counts involved the same type of sexual activity – fellatio - and were committed within a short time of each other, there were two separate and distinct acts of penetration, separated by significant intervening acts. *See State v. Jones*, 78 Ohio St.3d 12, 14, 676 N.E.2d 80 (1997). The first act of rape occurred while the girl was apparently semi-conscious. That act was followed by a withdrawal from the girl's mouth, the girl's apparent loss of consciousness, and then the defendant's forceful penetration of the unconscious girl's mouth. *Id.* at ¶ 49.

{¶ 60} Likewise, in *State v. J.M.*, 10th Dist. Franklin No. 14AP-621, 2015-Ohio-5574, the defendant was found guilty of two counts of anal rape and two counts of vaginal rape, which stemmed from one incident in which the defendant alternated between forcing his penis into the victim's anus and vagina. The trial court merged all four convictions into one, finding that the offenses were based on one act with the same animus. The court of appeals found multiple errors, one for merging the anal rapes with the vaginal rapes because the rapes were "committed to a different body part." *Id.* Of particular relevance to this case, the court also found that the two counts of anal rape did not merge with one another and the two counts of vaginal rape did not merge with one another. The court found that the offenses did not merge because the record demonstrated that intervening acts separated the instances of penetration. In the court's words, "[w]here [the defendant] was made aware of the hurt he was causing and where there was a period of cessation, each renewed penetration was committed separately." *Id.* at ¶ 53.

{¶ 61} We similarly reject Dean's claim that the "only event of time separating the two counts was [his] ejaculation and the victim's spitting out the ejaculate." Even if we assume, for the sake of argument, that those events are insufficient to demonstrate a "period of cessation" between the two rapes, in this case there is additional evidence indicating a bright line of distinction separating two rape offenses, i.e. his threat to I.M.R. that she "do it again" or "get killed." We find that the trial court had a reasonable basis to conclude that separate and distinct crimes were committed and that Dean acted with a

separate animus as to each. Accordingly, the trial court did not commit plain error by failing to merge the rape convictions.

**2. The Rape Convictions Do Not Merge with the Kidnapping Conviction**

{¶ 62} Next, we now turn to the issue of whether the kidnapping and rape convictions should merge.

{¶ 63} First, we consider whether the kidnapping caused I.M.R. to suffer harm that was "separate and identifiable" from the two rapes. Generally speaking, the farther the movement or the longer the duration of the restraint, the more likely it is that a kidnapping resulted in harm that is "separate and identifiable" from another offense. *See State v. Henry*, 37 Ohio App.3d 3, 523 N.E.2d 877 (6th Dist.1987) ("The farther the victim was removed from Bowling Green and the longer she was restrained, the less likely it was that she would be returned safely."); *State v. Riveria*, 10th Dist. Franklin No. 12AP-691, 2014-Ohio-842, ¶ 32 ("Continuously driving the victim around the city to different locations increased the chances that she would find it necessary to escape by jumping out of a moving vehicle or that one of the men would push her out of the moving vehicle if she attempted to resist.") .

{¶ 64} Here, the record shows that Dean kidnapped I.M.R. at gunpoint around 8:30 or 9:00 pm, led her for a "couple" of blocks to an alley and then to a "very dark" patio adjacent to an abandoned duplex, where he raped her, twice. I.M.R. eventually escaped and arrived at the hospital for treatment around 10:50 p.m. I.M.R. testified about the panic she experienced as she was forced to follow Dean down the street ("I just knew

29.

I was going to die") and her fear during the second assault ("I just knew I was going to end up in this abandoned house. Nobody was going to know what happened to me * * *. Nobody was looking for me.").

{¶ 65} Given the length of Dean's forced movement of I.M.R. down several city blocks, the overall duration of the restraint, and his confinement over I.M.R. in a dark patio of an abandoned house, we find that I.M.R. suffered harm as a result of the kidnapping that was "separate and identifiable" from the rapes.

{¶ 66} For similar reasons, we find that the kidnapping was committed separately and with separate animus. Dean argues that the kidnapping was merely incidental to the rapes because it was done for the sole purpose of raping I.M.R. He relies on *State v. Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345 (1979), in which the court held:

> In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each pursuant to R.C. 2941.25(B), this court adopts the following guidelines:
>
> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

30.

(b) Where the asportation or restraint of the victim subjects the

victim to a substantial increase in risk of harm separate and apart from that

involved in the underlying crime, there exists a separate animus as to each

offense sufficient to support separate convictions. *Id*. at syllabus.[1]

{¶ 67} In *Logan*, the defendant forced the victim into an alley and down a flight of

stairs before raping her at knifepoint. The court found that the crimes were committed

without a separate animus because the movement was slight, the detention was brief, and

the victim was released immediately after the commission of the underlying crime. *Id.* at

135. As other courts have recognized, however, kidnapping is not incidental to rape

where the confinement and restraint are more prolonged. *Riviera* at ¶ 29 (Confinement

and restraint for 30 to 40 minutes while the assailants drove the victim around the city

constitutes prolonged, long-term restraint); *State v. Wade*, 10th Dist. Franklin No.

10AP-159, 2010-Ohio-6395, ¶ 74 ("The kidnapping was not merely incidental to the

rape, which lasted five or ten minutes, but also involved prolonged restraint of 20 to 30

minutes.") (Reversed on sex offender classification grounds.); *State v. Broom*, 40 Ohio

---

[1] As noted by both parties, although *Logan* predates *State v. Ruff* by more than three decades, Ohio courts continue to apply the guidelines set forth in *Logan,* in accordance with the third prong of the *Ruff* test, when determining whether kidnapping and another offense were committed with a separate animus. *See e.g., State v. Armengau*, 10th Dist. Franklin No. 14AP-679, 2017-Ohio-4452, ¶ 125; *State v. D.E.M.*, 10th Dist. Franklin No. 15AP-589, 2016-Ohio-5638, ¶ 143; *State v. Williams*, 7th Dist. Mahoning No. 13 MA 125, 2015-Ohio-4100, ¶ 18; *State v. Stinnett*, 5th Dist. Fairfield No. 15-CA-24, 2016-Ohio-2711, ¶ 53.

31.

St.3d 277, 290, 533 N.E.2d 682 (1988). (The restraint and asportation of the victim at knifepoint, in a car, to a location over a mile away can hardly be considered merely incidental to the rape and murder of the victim.").

{¶ 68} For example, in *State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138 there were two separate victims of rape and kidnapping. The court of appeals found that the two convictions merged as to one victim, but not the other. The defendant attacked one victim by jumping out from behind a tree, held a knife to her throat, and moved her from the sidewalk to behind the tree where he raped her. The court found the "movement was done in conjunction with the rape, and was not separated by any significant length of time or distance." *Id.* at ¶ 38. The defendant forced the other victim into his car, hit her with a brick and drove her to a location where he raped her. The court found "the asportation of [victim two] constituted a separate crime for which [the defendant] may be separately punished." *Id.* at ¶ 40.

{¶ 69} Here, Dean moved I.M.R. for several city blocks at gunpoint and then confined her in a secretive location, on a dark patio of an abandoned house. Although the overall length of the restraint was not established with certainty, the testimony and other evidence suggests that Dean held I.M.R. for over an hour, and perhaps over two hours. We find this evidence demonstrates that the kidnapping was committed separately and with separate animus, and was not merely incidental to the rapes.

{¶ 70} Accordingly, we find Dean's second assignment of error not well-taken.

32.

**Costs of Confinement and Appointed Counsel**

{¶ 71} In this third assignment of error, Dean challenges the trial court's imposition of the cost of his appointed trial counsel and confinement.

{¶ 72} Prior to imposing the costs of confinement and assigned counsel, the trial court must first find that the defendant has, or will have, the ability to pay. With regard to the cost of confinement, R.C. 2929.18(A)(5)(a)(ii) requires that the trial court impose against all convicted defendants a financial sanction for the costs of confinement in a state institution "to the extent he is able to pay." Likewise, R.C. 2941.51(D) provides that the trial court can order the defendant to pay the cost of appointed counsel only if the court determines that the offender "has, or reasonably may be expected to have, the means to meet some part of the costs of the services rendered." *Id.* Although the court is not required to conduct a hearing on a defendant's ability to pay the costs, the record must contain some evidence that the court considered the defendant's financial ability to pay. *State v. Maloy*, 6th Dist. Lucas No. L-10-1350, 2011-Ohio-6919, ¶ 13.

{¶ 73} In its judgment entry, the trial court said that Dean was "found to have, or reasonably may be expected to have, the means to pay all or part of the applicable costs of supervision, confinement, assigned counsel, and prosecution as authorized by law." Dean argues that the trial court recited the proper language prior to imposing the costs of confinement and assigned counsel but "no evidence shows that it actually considered whether [he] had the ability to pay." We disagree.

33.

**{¶ 74}** Our standard of review on this issue is whether the imposition of costs and financial sanctions was contrary to law. R.C. 2953.08(A)(4) and (G)(2)(b). *State v. Farless*, 6th Dist. Lucas Nos. L-15-1060, 2016-Ohio-1571, ¶ 4 ("An appellate court may not modify a financial sanction unless it finds by clear and convincing evidence that it is not supported by the record or is contrary to law."). At sentencing, the trial court specifically stated that it had considered the record and based its conclusion on Dean's "youth and employability." The record supports the court's judgment. While Dean may argue that he lacks employment skills, a "Public Safety Assessment," indicates that Dean was employed as a painter at the time of his arrest, earning $500 per week. And although Dean also complains that his age at the time of his release, 39, will preclude him from finding much gainful employment, we find that he will nonetheless have many employable years ahead of him. While we agree that his convictions and incarceration may present a challenge to finding employment at that time, his relative young age and his work experience as a painter "render him employable and reasonably likely to be able to pay the costs imposed by the court." *State v. Duhart*, 6th Dist. Lucas No. L-16-1283, 2017-Ohio-7983, ¶ 33.

**{¶ 75}** We find that the imposition of costs here was not contrary to law. We therefore find that Dean's third assignment of error is not well-taken.

**Conclusion**

**{¶ 76}** We find that (1) Dean's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence; (2) the trial court did not err in denying Dean's motion for acquittal; (3) the court did not commit plain error in deciding not to merge the rapes with one another and the kidnapping conviction with his rape convictions; and (4) the trial court did not err in imposing the costs of confinement and appointed counsel against Dean. We, therefore, find Dean's three assignments of error not well-taken and affirm the December 12, 2016 judgment of the Lucas County Court of Common Pleas. Dean is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                  _____
                                                  JUDGE

James D. Jensen, J. _____

Christine E. Mayle, P.J. _____     _____
CONCUR.                                                     JUDGE

_____
                                                  JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.